IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

MARIA ELIZABETH MEYER,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

    Defendant.

No. C15-3120

REPORT AND RECOMMENDATION

---

## TABLE OF CONTENTS

I.    INTRODUCTION ................................. 2

II.    PROCEDURAL BACKGROUND ........................... 2

III.    PRINCIPLES OF REVIEW ................................. 3

IV.    FACTS ................................................ 4
    A.    Meyer's Education and Employment Background ............. 4
    B.    Administrative Hearing Testimony ...................... 5
        1.    Meyer's Testimony ............................. 5
        2.    Dr. Kristine Meyer's Testimony .................... 6
        3.    Vocational Expert Testimony .................... 6
    C.    Meyer's Medical History ......................... 7
    D.    Non-Medical Source Opinions ...................... 9

V.    CONCLUSIONS OF LAW ............................. 12
    A.    ALJ's Disability Determination .................... 12
    B.    Objections Raised By Claimant .................... 15
        1.    Credibility Determination .................... 15
        2.    Non-Medical Source Opinions .................... 20
        3.    RFC Assessment .................... 25

VI.    CONCLUSION .................................... 27

VII.    RECOMMENDATION ............................. 28

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 4) filed by Plaintiff Maria Elizabeth Meyer on June 11, 2015, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Meyer asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Meyer requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On May 29, 2012, Meyer applied for both disability insurance benefits and SSI benefits. In her applications, Meyer alleged an inability to work since January 1, 2009 due to Asperger's Syndrome, ADD, and recurrent migraine headaches. Meyer's applications were denied initially on August 8, 2012. On November 29, 2012, her applications were denied on reconsideration. On November 13, 2013, Meyer appeared via video conference with her attorney before Administrative Law Judge ("ALJ") David G. Buell for an administrative hearing. Meyer, Meyer's mother, Dr. Kristine Meyer, Ph.D., and vocational expert Roger F. Marquardt testified at the hearing. In a decision dated February 10, 2014, the ALJ denied Meyer's claims. The ALJ determined Meyer was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Meyer appealed the ALJ's decision. On April 14, 2015, the Appeals Council denied Meyer's request for review. Consequently, the ALJ's February 10, 2014 decision was adopted as the Commissioner's final decision.

On June 11, 2015, Meyer filed this action for judicial review. The Commissioner filed an Answer on August 14, 2015. On September 16, 2015, Meyer filed a brief arguing there is no substantial evidence in the record to support the ALJ's finding that she is not

disabled and that she is functionally capable of performing other work that exists in significant numbers in the national economy. On November 13, 2015, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On November 22, 2015, Meyer filed a reply brief. On November 23, 2015, Judge Mark W. Bennett referred this matter to a magistrate judge for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

### III. PRINCIPLES OF REVIEW

The Commissioner's final determination not to award disability insurance benefits following an administrative hearing is subject to judicial review. 42 U.S.C. § 405(g). The Court has the authority to "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." *Id*. The Commissioner's final determination not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3).

The Court "'must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.'" *Bernard v. Colvin*, 774 F.3d 482, 486 (8th Cir. 2014). Substantial evidence is defined as less than a preponderance of the evidence, but is relevant evidence a "'reasonable mind would find adequate to support the commissioner's conclusion.'" *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014). In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." 42 U.S.C. § 405(g). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012)

In *Culbertson v. Shalala*, the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

30 F.3d 934, 939 (8th Cir. 1994). In *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). *See also Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014) ("'As long as substantial evidence in the record supports the Commissioner's decision, [the court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently.' *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).").

## IV. FACTS

### A. Meyer's Education and Employment Background

Meyer was born in 1979. She is a college graduate. It took her seven years to graduate from college due to organizational problems and difficulties getting along with a music professor.[1] In the past, Meyer worked as a sales clerk and medical secretary.

---

[1] Meyer was a flute performance major in college.

4

## B. Administrative Hearing Testimony

### 1. Meyer's Testimony

At the administrative hearing, the ALJ inquired whether Meyer was working at the time of the hearing. Meyer responded that she worked part-time at a funeral home as a visitation host, taught a couple students as a private flute teacher, and worked "just very part-time" at a Bath and Body Works as a sales associate. She stated she works about 5 hours per week at the funeral home, 1 hour per week with two flute students, and about 3 hours per week at the Bath and Body Works.

Meyer's attorney asked Meyer to explain why she believed she is incapable of full-time work. Meyer explained:

> I very rarely feel well. I'm either in the midst of kind of a migraine attack or I'm coming off of one and it's exacerbated by kind of the stress of trying to get places or on time or, you know, find things in my house or, you know, trying to do what I need to all get done. And then I'm very exhausted all the time and it's just a constant pain.

> I would have to either — I would go home often or come in late or have to request to, you know, come in late or miss work and that, very notably, irritated my supervisors and, obviously, co-workers too because they would have to pick up my slack. And it just — it varied, it's just kind of an incapacitating type of pain that I have[.]

(Administrative Record at 92-93.) Meyer also noted she kept a migraine diary, which showed having pain "probably" 50 to 70 percent of days, and incapacitating pain 40 percent of the time. Meyer stated stress, changes in weather, noise, and fumes trigger her migraine headaches.

Meyer's attorney also asked Meyer to describe her life with Asperger's syndrome:

> Like other people are able to kind of feel their way through a situation or a social interaction. I think my way through, so it takes me a little longer to — you know, I have to kind of plan

5

out how I'm going to, you know, speak with someone or —
and so it — you know, sometimes my conversation or reaction
or interaction with someone is delayed or a little unnatural
maybe and it just is — it takes quite a bit of brain capacity for
me to, you know, concentrate on a social aspect of life, you
know, and instead of concentrating on, you know, stuff that
I'm doing.

(Administrative Record at 95.)

### 2. *Dr. Kristine Meyer's Testimony*

Dr. Kristine Meyer, Ph.D., ("Dr. Meyer") is Meyer's mother. She holds an M.A. in education and school counseling, a Ph.D. in educational leadership, and is a certified mental health counselor. Meyer's attorney asked Dr. Meyer to describe Meyer's difficulties with migraine headaches. Dr. Meyer stated Meyer's headaches affect her verbal communication skills and ability to perform routine functions like using the restroom or making food. Dr. Meyer estimated Meyer has 3 to 5 migraines per month, which could last for up to six days. Dr. Meyer testified that Meyer "is almost immobile and gets that paralyzed look. . . . [S]he's nauseous and vomits and just doesn't get dressed and stays on her couch or her bed for a long time because she just can't function with them."[2] Dr. Meyer further testified changes in weather, scents and smells, and stress trigger Meyer's migraines. Specifically, she stated "[s]tress is a big trigger for [Meyer] . . . . and as an Asperger's person, there's a lot of stress that involves social and emotional rigidity and so that kind of thing adds to it, so there's compounding factors."[3]

### 3. *Vocational Expert Testimony*

At the hearing, the ALJ provided vocational expert Roger F. Marquardt with a hypothetical for an individual who:

---

[2] Administrative Record at 101.

[3] *Id.* at 102.

cannot be exposed to humidity, dust, fumes, things like that and also needs to avoid excessive noise. . . .

And, in addition, I want you to assume that she's limited to performing only most simple, routine and repetitive types of work, work that doesn't require any close attention to detail, doesn't require the use of any independent judgment on the job[.] . . .

And, finally, I want you to assume the worker requires an occupation where all of the tasks that would be assigned to her can be performed without any interaction with the public.

(Administrative Record at 108-109.) The vocational expert testified that under such limitations, Meyer would be unable to perform her past relevant work, but could perform the following jobs: (1) production assembler, (2) mail clerk, and (3) sewing machine operator.

### C. Meyer's Medical History

On February 9, 2012, Meyer met with Dr. Crystal M. Menken, Psy.D., complaining of depressed mood, impaired concentration, and sleep disturbance. In her interview with Meyer, Dr. Menken found:

[Meyer] was a loner growing up and has always had a hard time fitting in socially. . . . She has an extreme sensitivity to lights, sounds, and smells. . . . [Meyer] acknowledged (and it was observed) that she struggles with making eye contact with others. She believes that she misses subtle social and emotional cues from others. . . . Her mother reported that they have always worked with her to teach her what is appropriate vs inappropriate to say to others in public. She described adhering to some inflexible routines, including that she must take her medications with chocolate milk and that she cannot ever skip showering a day. [Meyer] reports that unless she takes Ritalin, she has great difficulty focusing and staying on task and struggles to complete tasks. [Meyer] has been unable to keep jobs due to her sensitivities triggering migraine headaches and difficulties getting along with co-workers.

7

(Administrative Record at 618.) Upon examination, Dr. Menken diagnosed Meyer with Asperger's disorder, depressive disorder, and migraine headaches (per Meyer's report). Dr. Menken's goals for Meyer were to: (1) provide education on Asperger's disorder, (2) increase her social skills, (3) improve her ability to gain/maintain employment, (4) decrease her depression symptoms, and (5) increase healthy coping skills. Dr. Menken concluded:

> [Meyer] is a 32-year old female who has felt like she has never fit in socially and has been treated for depression for the past 14 years. She has few friends, narrow interests, and has not been able to hold a job due to extreme sensitivities to lights/sounds/smells that trigger migraine headaches and difficulty getting along with co-workers. . . . [Meyer] is "satisfied" with her social life, which includes interactions with family and a small group of people from her church. However, she is not satisfied with her lack of employment.

(Administrative Record at 621-22.)

On July 14, 2012, Meyer was referred by Disability Determination Services ("DDS") to Carroll D. Roland, Ph.D., for a psychological evaluation. Meyer presented with the following health problems: Asperger's disorder, depression, ADD, and migraines. Dr. Roland noted Meyer "reports 18 to 24 migraines per month with a duration lasting between 2 to 6 days."[4] Meyer rated her migraine pain at 6-9 on a scale of 1 to 10, with 10 being the greatest amount of pain. Dr. Roland also reviewed Meyer's psychiatric history:

> [Meyer's] primary care provider diagnosed [her] with Attention Deficit Disorder: predominately inattentive type and Asperger's Disorder. [She] was seen on 1 or 2 occasions at the local mental health center but otherwise has had no psychotherapy as she reportedly did not need it. She has never been hospitalized for mental health reasons. [Meyer] is

---

[4] Administrative Record at 427.

> currently receiving 15 hours a month of in-home assistance
> from Northstar. This is a community assistance program that
> is charged with helping [Meyer] organize her home and
> appointments, etc.

(Administrative Record at 428.) Upon examination, Dr. Roland found Meyer's memory to be intact. Dr. Roland opined that she had the ability to remember 2 and 3-step instructions given by supervisory personnel. Dr. Roland also found Meyer is able to understand basic societal mores. Dr. Roland noted Meyer's "history of disorganization, difficulty focusing and susceptibility to distraction in her environment" were consistent with ADD.[5] Dr. Roland also noted that Meyer reported "significant improvement" of her symptoms with Ritalin. Dr. Roland further found Meyer's depression was "well controlled" with Zoloft and Bupropion. Dr. Roland opined that Meyer's Asperger's disorder "causes impairment in social functioning."[6] Dr. Roland diagnosed Meyer with Asperger's disorder, ADD, major depressive disorder, minor schizoid personality features, and migraine headaches.

### D. Non-Medical Source Opinions

In a letter dated September 18, 2012, Theresa Schwem, a community support worker who helped Meyer, provided information regarding Meyer's daily functional abilities. Schwem stated she had worked with Meyer for four months, and observed severe migraine headaches that were disabling. Schwem also noted:

> I have observed when we are working together, her attention
> span is very short. Usually when we are working, within a
> half hour, her concentration severely falters and it's hard for
> her to get back on track again. She seems very lost, and we
> cannot get back to what we are doing.

---

[5] *Id.* at 431.

[6] *Id.*

9

(Administrative Record at 323.) Schwem also noted she was unable to meet with Meyer from July 3-17 and August 27-31 due to Meyer having severe migraine headaches. Finally, Schwem stated she and other Northstar Community Services staff help Meyer "with organization of her house, bills, appointments (for tardiness), [and] medications, because of her ADD, Asperger's, severe migraines, and minor schizoid personality features."[7]

In a vocational report for the time period of March 26, 2013 through April 5, 2013, Emily Dykstra, a vocational services coordinator at NIVC Services, Inc., noted Meyer attended all six of her scheduled evaluation dates, but was 15-90 minutes late for each shift. Meyer also left her job early on two occasions due to migraine headaches. Dykstra opined that Meyer's "attendance meets expectations for competitive employment (90% or better), but her punctuality and chronic migraines will limit her employability."[8] Meyer's work production and quality were deemed "excellent" by NIVC Services staff. Dykstra recommended six-week work adjustment training to address Meyer's tardiness and punctuality issues.

In the work adjustment report from May 1, 2013 through June 7, 2013, Dykstra noted Meyer attended all of her scheduled worked shifts and had a production rate of 70% to 78%, which met expectations for competitive employment. Dykstra opined that:

> [Meyer] made excellent progress in using a daily routine chart to become more reliable at arriving to work on time. However, without ongoing positive reinforcement and continuing practice at this skill, [Meyer's] ADHD and anxiety will continue to affect her employability by limiting her punctuality.

---

[7] Administrative Record at 323.

[8] *Id.* at 374.

(Administrative Record at 382.)  Dykstra recommended a job coach to help her with punctuality and adjusting her daily routine schedule as needed.

On July 1, 2013, Susan Faber, Meyer's vocational counselor, opined "[i]t is very clear that [Meyer] does need ongoing supports to maintain her minimal employment, which does not come close to substantial gainful activity."[9]  Faber also discussed Meyer's difficulties with punctuality:

> [Meyer] has extreme difficulty being on time and getting out of her house and getting all the things done she needs to do in order to get out of the house to get to work.  NIVC has made laborious charts of everything she does, from the moment she tries to get out of bed to when she goes to work.  Even with that, she was only able to be on time 61% of the time.  Anything that throws that schedule off makes it very difficult for her to then figure out what she's supposed to do when.  NIVC will be requesting ongoing job coaching . . . as without ongoing job coaching, the strides she's made will fall apart.

(Administrative Record at 387.)  Faber estimated Meyer's maximum ability to work per week is "probably" 10 hours or less.  Faber indicated that Meyer did excellent work, but performed at a slow production rate.  Faber concluded:

> Her ADHD and anxiety will continue to affect her employability by limiting her punctuality.  She's always going to require an off-site job coach to discuss punctuality and make changes and additions to her daily routine schedule, as needed.  Without this ongoing level of support, her minimal employment would be jeopardized.

(Administrative Record at 388.)

In a letter dated October 17, 2013, Barbara Anderson, a community support worker who met with Meyer twice weekly to help Meyer set goals, observed:

> Because of [Meyer's] Asperger's Syndrome, it is very hard for her to maintain paperwork or organize her home without much

---

[9] Administrative Record at 387.

difficulty. Her disease manifests itself in either not being able
to adequately focus on a task or to over-focus on a task making
it impossible to complete simple jobs.

(Administrative Record at 554.) Anderson also addressed Meyer's chronic migraine headaches, and opined that the migraines "are debilitating and she has them weekly."[10] Anderson concluded "I do not believe [Meyer] could work in a job with any structure to it. Even with a flexible schedule, it would be impossible for her to maintain a set routine."[11]

Heidi Berg, a community services supervisor, also provided a letter dated October 18, 2013, regarding Meyer's need for community support services. Berg indicated North Star Community Services meets with Meyer twice per week, and helps Meyer organize all areas of her life so that she can live effectively on her own. Berg opined:

In regards to her ability to perform in a competitive work
environment, [Meyer] will struggle. Her ability to plan and
organize is poor. She lacks time management skills and has
difficulty developing a time management system. In my
personal opinion, I cannot see [Meyer] working a typical
8-hour work day. I think she will have difficulty staying on
task, and lacks the organizational skills to perform effectively
every day.

(Administrative Record at 552.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined Meyer is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*,

---

[10] Administrative Record at 554.

[11] *Id.*

482 U.S. 137, 140-42 (1987); *Moore v. Colvin*, 769 F.3d 987, 988 (8th Cir. 2014). The five steps an ALJ must consider are:

> (1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is or approximates an impairment listed in Appendix 1; (4) whether the claimant can perform past relevant work; and, if not, (5) whether the claimant can perform any other kind of work.

*Hill v. Colvin*, 753 F.3d 798, 800 (8th Cir. 2014); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "'bears the burden of demonstrating an inability to return to [his] or her past relevant work.'" *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "'the claimant has the physical residual functional capacity to perform a significant number of

other jobs in the national economy that are consistent with [his or] her impairments and vocational factors such as age, education, and work experience.'" *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a)(1); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or] her limitations.'" *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined Meyer had not engaged in substantial gainful activity since January 1, 2009. At the second step, the ALJ concluded from the medical evidence Meyer has the following severe impairments: mood disorder, ADD, Asperger's disorder, and recurrent headaches. At the third step, the ALJ found Meyer did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Meyer's RFC as follows:

> [Meyer] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: should avoid all exposure to humidity, dust, fumes, and excessive (loud) noise; should work in a temperature controlled environment (with appropriate air filters); is limited to performing simple, routine, and repetitive tasks that do not require any close attention to detail or use of independent judgment; should not be required to adapt to any significant changes in the work environment; and requires an occupation where all of the tasks assigned to her can be performed without interaction with the public.

(Administrative Record at 59.) Also at the fourth step, the ALJ determined Meyer was unable to perform her past relevant work. At the fifth step, the ALJ determined that based

on her age, education, previous work experience, and RFC, Meyer could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded Meyer was not disabled.

## B. Objections Raised By Claimant

Meyer argues that the ALJ erred in three respects. First, Meyer argues the ALJ failed to properly evaluate her subjective allegations of disability. Second, Meyer argues the ALJ failed to properly evaluate and address evidence from non-medical sources. Lastly, Meyer argues the ALJ's RFC assessment is flawed because it is not supported by substantial evidence.

### 1. Credibility Determination

Meyer argues the ALJ failed to properly evaluate her subjective allegations of disability. Meyer maintains the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues the ALJ properly considered Meyer's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman v. Astrue*, 596 F.3d 959, 968 ((8th Cir. 2010); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the *Polaski* factors.'" *Renstrom*, 680 F.3d at 1066; *see also Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010).

In his decision, the ALJ generally determined that:

> After careful consideration of the evidence, the undersigned finds that [Meyer's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Meyer's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Administrative Record at 60.) The ALJ exhaustively reviewed Meyer's complaints of migraine headaches, difficulties associated with Asperger's disorder, and other physical and mental health problems, pointing out that Meyer's symptoms were consistently improved with treatment.[12] The ALJ further addressed Meyer's credibility in great detail:

> In sum, the above residual functional capacity assessment is supported by the evidence of record as a whole. Despite the fact that she was just recently diagnosed with having Asperger's disorder, the evidence of record indicates that [Meyer] has experienced symptoms associated with her Asperger's disorder since childhood (i.e. Exhibit 1F/8). Nonetheless, [she] has demonstrated an ability to work well above the substantial gainful activity level for prolonged periods on multiple occasions (i.e. Exhibits 5D and 5E), despite the limiting effects of her Asperger's disorder. In fact, [Meyer] reported that she ultimately quit her full-time job as a medical receptionist in 2007 because she wanted to study to become a medical interpreter for Spanish speaking patients (Exhibit 3F/4), as opposed to being resultant from any physical or psychological impairment/limitations.
>
> [Meyer] alleges having significant social limitations as the result of her Asperger's disorder. However, the majority of her historical work activity has directly involved interaction with the general public and/or coworkers. In addition to her current and historical employment, [Meyer] has attended college, sings in a chorus, plays in a municipal band, and even teaches flute lessons, all of which require direct contact and/or interaction with others.
>
> In reviewing the evidence of record, it is evident that [Meyer's] primary limiting impairment is her chronic migraine headaches. [She] provided a copy of her migraine journal, which includes descriptions of the frequency, duration, and

---

[12] *See* Administrative Record at 60-64 (providing thorough review of treatment for Meyer's complaints associated with migraine headaches, Asperger's disorder, and other minor physical and mental health impairments).

alleged limiting effects of her migraine headaches from April 2011 until November 2013 (Exhibit 11F). However, in comparing her migraine journal to the remaining evidence of record, it does not appear that her migraine journal is very consistent with the remaining evidence of record.

For example, emergency room treatment records indicate that [Meyer] was briefly treated for migraine headache complaints in early October 2012 (Exhibit 8F/12-15). Yet, there is no evidence of any migraine symptoms documented within her journal between July 2, 2012 and October 19, 2012 (Exhibit 11F/7-8).

On the other hand, [she] reported having 13 migraine episodes from May 5, 2013, through June 4, 2013, each of which she rate at a 7/10 or higher (Exhibit 11F/16-18). However, [Meyer] was noted to have been scheduled for 18 half-day shifts for a vocational rehabilitation program between May 1, 2013 and June 7, 2013 (Exhibit 17E/7-11). The vocational rehabilitation records indicate that [she] attended all 18 shifts as scheduled. The vocational rehabilitation records also indicated that [her] primary difficulty with work functioning was with punctuality, as opposed to being related to a short attention span, headaches, or interpersonal problems.

In addition to the above examples, [Meyer's] migraine journal is inconsistent with the treatment notes throughout the evidence of record, which consistently fail to support that [her] migraine headaches occur at the frequency or severity that she alleges. During her clinical intake assessment through the Mental Health Center of North Iowa in mid-March 2012, [Meyer] reported having a history of migraine headaches (Exhibit 1F/6). However, she specifically denied that she experienced any limitations due to her physical health. The evidence of record as a whole indicates that [Meyer] has generally responded very well to her migraine medication regimen, particularly when she has received Toradol injections for her most severe migraine attacks. In fact, during her subsequent clinical assessment in mid-April 2013, [she] acknowledged that her migraine headaches had gone "from chronic to less

frequent" (Exhibit 7F/4), which is inconsistent with her subjective allegations at the hearing.

[Meyer] has lived alone throughout the relevant period being evaluated. She has performed a variety of work during this period and continues to work three different jobs. As noted above, during her only outpatient therapy session in early March 2012, both [Meyer] and her mother reported that they felt [she] was capable of successfully performing a job in medical coding where she would not have to closely interact with others (Exhibit 12F/2). Their main concern was whether or not [she] would be able to find such a job, as opposed to being concerned about whether or not she was capable of performing such a job. Overall, the evidence of record consistently demonstrates that [Meyer] is capable of working at the above-assessed residual functional capacity.

(Administrative Record at 66-68.)

In his decision, the ALJ thoroughly considered and discussed Meyer's treatment history, the objective medical evidence, her functional restrictions, use of medications, work history, and activities of daily living in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Meyer's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Meyer's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue,

the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## 2. *Non-Medical Source Opinions*

Meyer argues the ALJ failed to properly evaluate and consider evidence from non-medical sources. Specifically, Meyer argues the ALJ failed to properly evaluate the testimony of her mother, Dr. Meyer. Meyer also argues in general, the ALJ failed to properly address the opinions of various community support workers, and in particular, the opinions of Susan Faber, a vocational rehabilitation specialist. Meyer maintains this matter should be remanded for further consideration of the non-medical source evidence.

The Social Security Administration considers community support workers, vocational rehabilitation specialists, and parents to be acceptable, non-medical sources. *See* 20 C.F.R. §§ 404.1513(d); 416.913(d); *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (providing non-medical sources include social welfare agency personnel, rehabilitation counselors, and parents). Social Security Ruling 06-03p explains how the SSA considers opinions from sources not classified as "acceptable medical sources," or "other non-medical sources." *See Id*. SSR 06-03p provides that when considering the opinion of a source that is classified as an other, non-medical source, such as a case worker or special education facilitator, "it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03p. Furthermore, in discussing SSR 06-03p, the Eighth Circuit Court of Appeals, in *Sloan*, pointed out:

> Information from these 'other sources' cannot establish the existence of a medically determinable impairment, according to SSR 06-3p. Instead, there must be evidence from an

20

'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

*Sloan*, 499 F.3d at 888 (quoting SSR 06-03p). In determining the weight afforded to "other source" evidence an "ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (citation omitted).

In his decision, the ALJ thoroughly addressed the opinions of all the non-medical sources. In addressing the statements of Meyer's parents, the ALJ determined:

Pursuant to SSR 06-3p, the undersigned has considered the third party opinions submitted by [Meyer's] father, Donald Meyer, from May 2012 (Exhibit 3E). However, minimal weight is given to Mr. Meyer's opinions because they essentially mirror [Meyer's] allegations, which were found to be only partially credible.

The undersigned has also considered the third party opinions submitted by the claimant's mother, Dr. Meyer, from her testimony at the hearing. However, similar to the opinions of Mr. Meyer, minimal weight is given to Mrs. Meyer's opinions because they essentially mirror [Meyer's] allegations, which were found to be only partially credible. Mrs. Meyers [(*sic*)] testified that she has some training in mental health issues, but specifically acknowledged that she was testifying as a witness, as opposed to testifying as an expert in [Meyer's] medical treatment.

Mrs. Meyers [(*sic*)] testified that [Meyer] experiences headaches that occur three to five times per month and persist for four to six days at a time. However, if the undersigned was to accept her testimony on this issue as stated, this would mean that [Meyer] is incapacitated for at least 12 days per month, which is highly unlikely considering her current and historical work activity, particularly when compared to the medical evidence of record.

Although Mrs. Meyer testified that [Meyer] has significant attention and concentration difficulties as the result of her ADD, there is no indication that [Meyer] would not be able to sustain adequate attention and concentration for the performance of simple and repetitive tasks in a work setting that does not require any significant social interaction. In fact, during her only outpatient therapy session in early March 2012, both [Meyer] and her mother reported that they felt [Meyer] was capable of successfully performing a job in medical coding where she would not have to closely interact with others (Exhibit 12F/2), which is consistent with the limited social interactions in the above-assessed residual functional capacity.

Mrs. Meyer additionally testified that [Meyer] becomes immobile and essentially paralyzed during her migraine headaches. However, this is inconsistent with the medical evidence of record, which indicates that [Meyer] has required Toradol injections no more than a few times each year for her most severe headaches. The associated treatment records from these visits fail to indicate any significant associated immobility or paralysis. Instead, they indicate that the Toradol injections were very effective at quickly providing adequate symptomatic relief. On the other hand, [Meyer] herself has acknowledged that she is able to tolerate her more frequent/less severe headaches without significant problem (i.e. Exhibit 5F/17), which is consistent with her current and historical work history.

(Administrative Record at 65.)

It is clear from the ALJ's decision that he considered and addressed the testimony and statements of Meyer's parents, particularly the testimony of Meyer's mother, Dr. Meyer. Furthermore the ALJ provided reasons for discounting the testimony of Meyer's parents. By providing reasons for discrediting Meyer's parents, the ALJ did more than is necessary according to the Eighth Circuit Court of Appeals, for evaluating the credibility of third-party witnesses. In *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th

Cir. 1992), the Eighth Circuit determined that failure to provide any reasons for discrediting a third-party witness is not error when support for discrediting such a witness is found in the same evidence used by an ALJ to find that a claimant's testimony is not credible. *See also Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995) ("[A]lthough the ALJ failed to list specific reasons for discrediting the testimony of Carol Bennett, it is evident that most of her testimony concerning Lorenzen's capabilities was discredited by the same evidence that discredits Lorenzen's own testimony concerning his limitations."); *Buckner*, 646 F.3d at 559-60 (discussing *Robinson* and *Lorenzen* and applying that reasoning to testimony from the claimant's girlfriend). Because the ALJ explicitly considered the testimony and statements of Meyer's parents in his decision, and provided reasons for discrediting their testimony and statements, the Court concludes the ALJ properly addressed their testimony in making his credibility determinations. Moreover, the Court finds that the reasons articulated by the ALJ for discrediting Meyer's are supported by the reasons for discrediting Meyer's own testimony regarding her limitations. *See Buckner*, 646 F.3d at 559-60; *Lorenzen*, 71 F.3d at 319.

The ALJ also addressed the opinions of community support workers who assist Meyer:

> In mid-September 2012, Theresa Schwerm [(*sic*)], a support worker from Supportive Community Living, completed a statement, which included her opinion that [Meyer] has a very short attention span that interferes with her ability to work. However, minimal weight is given to Ms. Schwerm's [(*sic*)] opinion on this issue because there is minimal medical evidence within the record to support her opinion. Ms. Schwerm's [(*sic*)] opinion on this issue is inconsistent with the fact that [Meyer] has learned to play the flute at a very high level, received her Bachelor's degree, teaches the flute, and drives, all of which would reasonably require a significant amount of attention and concentration. . . .

In mid-October 2013, Heidi Berg and Barbara Anderson, support workers from North Star Community Services, each completed medical source statements that included very limiting opinions specific to [Meyer's] overall functional abilities (Exhibit 9F/2 and 4). However, minimal weight is given to Ms. Berg and Ms. Anderson's opinions on these issues because their opinions are inconsistent with the evidence of record as a whole.

For example, Ms. Berg opined that [Meyer] would be unable to work a typical 8-hour workday due to perceived difficulties staying on task and a lack of organizational skills (Exhibit 9F/2). However, [Meyer] has previously demonstrated an ability to work a typical 8-hour workday for significant periods of time in multiple jobs (i.e. Exhibit 5E), despite having symptoms associated with her Asperger's disorder since childhood.

Ms. Anderson indicated that [Meyer] experiences very frequent migraine headaches that are "odor driven", which led her to opine that it would be impossible for [Meyer] to work in a job with any structure to it (Exhibit 9F/4). However, Ms. Anderson's opinions on these issues are grossly inconsistent with the fact that [Meyer] has worked for approximately 10 years for a "bath and body" retail store that is filled with various fragrances, some of which was full-time work (based on her testimony). Additionally, [Meyer's] historical and current work activity demonstrates that the claimant is in fact capable of working in a job with structured hours.

(Administrative Record at 66.) The ALJ also addressed the opinions of Susan Faber:

In early July 2013, Susan Faber, IVRS, completed a statement where she opined that [Meyer's] maximum ability to work was "probably 10 hours or less" (Exhibit 18E/4). However, minimal weight is given to Ms. Faber's opinion on this issue because her opinion is inconsistent with the remaining vocational rehabilitation records, as well as with the evidence of record as whole. As is discussed in further detail below, the vocational rehabilitation records indicate that [Meyer's]

primary difficulty with work functioning was with punctuality, as opposed to being related to a short attention span, headaches, or interpersonal problems (Exhibit 17E/7-11). [Meyer] has also successfully demonstrated an ability to perform full-time work in the past, without any help from vocational rehabilitation, which is grossly inconsistent with Ms. Faber's opinion on this issue.

(Administrative Record at 66.)

Having reviewed the entire record, the Court finds that the ALJ properly considered the various opinions of the community support workers and the opinions of Faber in accordance with SSR 06-03p. Furthermore, the Court finds that the ALJ fully and fairly developed the record with regard to these opinions, and adequately explained his reasoning for finding inconsistencies between their opinions and the record as a whole. *See Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007) (providing that an ALJ has a duty to develop the record fully and fairly). Great deference is given to an ALJ's evaluation of "other source" evidence, and the Court concludes that the ALJ adequately addressed the evidence from the non-medical sources. *See Raney*, 396 F.3d at 1010. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3. *RFC Assessment*

Meyer argues the ALJ's RFC assessment is flawed. Specifically, Meyer argues the ALJ's RFC assessment is incomplete because it does not properly account for all of her impairments and functional limitations. Meyer also argues the ALJ's RFC assessment is not supported by substantial evidence in the record. Meyer maintains this matter should be remanded for a new RFC determination based on a fully and fairly developed record.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of

other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Additionally, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

In determining Meyer's RFC, the ALJ thoroughly addressed and considered Meyer's medical history and treatment for her complaints.[13] The ALJ also properly considered and thoroughly discussed Meyer's subjective allegations of disability in making her overall disability determination, including determining Meyer's RFC.[14] Therefore, having reviewed the entire record, the Court finds the ALJ properly considered Meyer's medical records, observations of treating and non-treating physicians, and Meyer's own description of her limitations in making the ALJ's RFC assessment for Meyer.[15] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes Meyer's assertion that the ALJ's RFC assessment is flawed is without merit.

## VI. CONCLUSION

I find the ALJ properly determined Meyer's credibility with regard to her subjective allegations of disability, properly considered and addressed the opinions of non-medical sources, and properly determined Meyer's RFC based on a fully and fairly developed record. Accordingly, I believe the ALJ's decision is supported by substantial evidence and should be affirmed.

---

[13] *See* Administrative Record at 60-68 (providing a thorough discussion of Meyer's overall medical history and treatment).

[14] *Id*. at 60-64; 66-68 (providing a thorough discussion of Meyer's subjective allegations of disability).

[15] *Id*. at 18-23 (providing thorough discussion of the relevant evidence for making a proper RFC determination).

## VII.  RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the district court **AFFIRM** the final decision of the Commissioner of Social Security and enter judgment against Meyer and in favor of the Commissioner.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court.

DATED this 2nd day of February, 2016.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA